Richard W. NORTON, Jr.,

v.

UNITED STATES of America.

Civ. A. No. 4674.

United States District Court
W. D. Louisiana, Shreveport Division.

Sept. 28, 1956.

F. Leonard Hargrove, Cecil E. Ramey, Jr. and Hargrove, Guyton, Van Hook & Hargrove, Shreveport, La., W. B. Ferguson, Jr., Houston, Tex., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe and David A. Wilson, Jr., Dept. of Justice, Washington, D. C., T. Fitzhugh Wilson, U. S. Atty., and Meredith T. Holt, Asst. U. S. Atty., Shreveport, La., for the Government.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

This action having been submitted for decision, by the Court without a jury, the Court having considered the pleadings, the stipulation of counsel, the exhibits, the deposition of the single witness who testified, and the briefs of counsel, makes the following

Findings of Fact.

1.

This action, filed on July 23, 1954, is to recover certain income taxes in the amount of $21,400.95, together with interest thereon, assessed by defendant's Commissioner of Internal Revenue against plaintiff, and collected for the United States by defendant's Collector or Acting Collector of Internal Revenue for the Louisiana and Texas Districts, none of whom are now in office as such.

2.

Since 1945, plaintiff has resided in Shreveport, Caddo Parish, Louisiana, in this District and Division, having resided prior thereto in San Antonio, Texas.

3.

Plaintiff timely filed his federal income tax return for the calendar year 1945, reporting tax due of $41,356.52, which sum was paid in full on or about the dates, in the amounts and to the Collectors as follows:

| Date | Amount | To Whom Paid |
|------|--------|--------------|
| March 7, 1945 | $ 2,482.50 | Collector of Internal Revenue, Austin, Texas. |
| June 12, 1945 | 2,482.50 | Collector of Internal Revenue, Austin, Texas. |
| September 10, 1945 | 2,482.50 | Collector of Internal Revenue, Austin, Texas. |
| January 12, 1946 | 33,552.50 | Collector of Internal Revenue, New Orleans, Louisiana. |
| March 5, 1946 | 356.52 | Collector of Internal Revenue, New Orleans, Louisiana. |
| | $41,356.52 | |

4.

Plaintiff timely filed his federal income tax return for the calendar year 1946 with the Collector of Internal Revenue, New Orleans, Louisiana, reporting a tax due of $11,030.78, which sum was paid in full to said Collector of Internal Revenue on or about the dates and in the amounts as follows:

| | |
|---|---|
| March 5, 1946 | $10,000.00 |
| June 14, 1946 | 3,333.33 |
| September 3, 1946 | 3,333.33 |
| Total | $16,666.66 |
| Less: Refunded | |
| June 17, 1947 | 5,635.88 |
| Total | $11,030.78 |

5.

Thereafter, in the latter part of the year 1949, defendant's Commissioner of Internal Revenue made assessments against plaintiff for alleged deficiencies in income taxes for the calendar years 1945 and 1946, plus interest thereon, totaling $22,404.02, made up of the following items:

Year 1945

| | | |
|---|---|---|
| Income Taxes | $ 7,423.57 | |
| Interest | 1,618.03 | $ 9,041.60 |

Year 1946

| | | |
|---|---|---|
| Income Taxes | 11,539.64 | |
| Interest | 1,822.78 | 13,362.42 |
| Total | | $22,404.02 |

Plaintiff paid these alleged deficiencies on income taxes for the years 1945 and 1946, together with interest thereon, to defendant's Collector of Internal Revenue for the Louisiana District, New Orleans, Louisiana, on or about November 1, 1949.

6.

On or about October 3, 1951, plaintiff filed with defendant's Collector of Internal Revenue of the Louisiana District, New Orleans, Louisiana, claims for refund of part of the income taxes and interest theretofore paid by plaintiff for the calendar years 1945 and 1946 as set forth above, in the respective amounts of $8,038.53 and $13,362.42, or a total of $21,400.95, made up of the following items:

Year 1945

| | | |
|---|---|---|
| Income Taxes | $ 6,600.00 | |
| Interest | 1,438.53 | $ 8,038.53 |

Year 1946

| | | |
|---|---|---|
| Income Taxes | 11,539.64 | |
| Interest | 1,822.78 | 13,362.42 |
| Total | | $21,400.95 |

7.

The Commissioner of Internal Revenue, acting through the Acting Head of the Collection Division of the Bureau of Internal Revenue, on October 17, 1952, mailed to plaintiff, by registered mail, a letter notifying plaintiff that his claims for refund of income taxes and interest thereon paid for the calendar years 1945 and 1946 had been disallowed in their entirety.

**8.**

The Richard W. Norton, Jr., Trust had its situs in the State of Texas. It was established on June 3, 1935, having been created by R. W. Norton and wife, Annie Norton, the father and mother of Richard W. Norton, Jr., plaintiff. He was its sole income and principal beneficiary. The Trust terminated according to its terms on September 6, 1944, plaintiff's twenty-fifth birthday, and all of its properties thereupon were distributed to plaintiff, as sole beneficiary, being received and held by him for the production of income. The value of the assets so received and held by plaintiff was substantially in excess of the taxes and interest subsequently assessed against him under the provisions of Section 311(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C. § 311(a) (1).

**9.**

The Richard W. Norton, Jr., Trust timely filed income tax returns on the cash basis for each of the years pertinent hereto, and paid the income tax liability reflected on its returns. The net income of the Trust for the year of its termination, 1944, as required by the provisions of Section 162 of the Internal Revenue Code of 1939, 26 U.S.C. § 162, was included in plaintiff's individual net income, and the tax resulting from such inclusion was assessed against and collected from plaintiff for the year 1944. The 1944 net income of the Trust, so included in plaintiff's 1944 individual net income, amounted to $71,813.84. The total income tax assessed against, and paid by, plaintiff for 1944 amounted to $66,940.59.

**10.**

When the Trust terminated on September 6, 1944, a dispute was pending between the Trust and the Bureau of Internal Revenue as to the amount of income tax liability of the Trust for the year 1940. After termination of the Trust, and distribution of all of its properties to plaintiff, a further dispute arose between plaintiff and the Bureau of Internal Revenue as to the amount of the Trust's income tax liability for the year 1941. During the year 1945, by agreement between plaintiff and the Bureau of Internal Revenue, these disputes were compromised, and the amount of the taxes and interest resulting therefrom was assessed against plaintiff, pursuant to Section 311(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C. § 311(a) (1); and plaintiff paid to the Collector of Internal Revenue at Austin, Texas, the determined deficiencies, together with interest in the amount of $23,316.-95.

**11.**

In his determination, assessment and collection of plaintiff's 1945 income tax, the Commissioner of Internal Revenue allowed deduction for that portion of the above described interest attributable to the period subsequent to September 6, 1944, when the Trust terminated, but disallowed deduction for all of the interest attributable to the period prior to September 6, 1944, which interest amounted to $16,982.52.

**12.**

After September 6, 1944, a further dispute arose between plaintiff and the Bureau of Internal Revenue as to the amount of the Trust's income tax liability for the years 1942 and 1943. During the year 1946, that dispute was compromised, and the taxes and interest resulting therefrom were assessed against plaintiff under Section 311(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C. § 311(a) (1). Plaintiff paid the determined deficiencies, together with interest in the sum of $23,070.43 to the Collector of Internal Revenue at Austin, Texas.

**13.**

In his determination, assessment and collection of plaintiff's 1946 income tax, the Commissioner of Internal Revenue allowed deduction for that portion of the above described interest attributable to the period subsequent to September 6, 1944, but disallowed deduction for all interest attributable to the period prior to September 6, 1944, which interest amounted to $972.98.

**14.**

During the year 1946, plaintiff had on deposit with, and in the custody of Irving Trust Company, One Wall Street, New York, New York, a large quantity of stocks, bonds and cash, totaling in value approximately $5,000,000. Under plaintiff's written agreement with Irving Trust Company, the latter, in addition to other duties, was required to make purchases and sales of stocks and other properties for plaintiff's account upon instruction of his investment counsel, Scudder, Stevens & Clark, One Wall Street, New York, New York. Such investment counsel, in turn, by written agreement executed by plaintiff, were authorized to issue instructions to Irving Trust Company for such purchases and sales, without securing plaintiff's prior approval.

**15.**

Plaintiff's mother, Mrs. Annie Norton, having approximately $2,000,000 in stocks, bonds and cash on deposit with, and in the custody of Irving Trust Company, had similar but separate written agreements with that Company and with Scudder, Stevens & Clark. Both accounts were maintained in the same file of Scudder, Stevens & Clark, and were handled by Mr. Dwight Rogers, of that firm. From time to time, he made written reports and recommendations as to both accounts to the attorney for both plaintiff and his mother, Mr. Leonard Hargrove, of Shreveport. Whenever he visited Shreveport, a joint discussion of these accounts was held among Mr. Rogers, plaintiff, his mother and Mr. Hargrove.

**16.**

Neither plaintiff nor his mother had authority to purchase or sell securities or stocks for the account of the other, or to issue instructions to Irving Trust Company, or to Scudder, Stevens & Clark, for such purchases or sales for the account of the other.

**17.**

During 1946, Irving Trust Company, acting on instructions given by Mr. Rogers, pursuant to the general authorization described above, and without first informing, or securing the approval of, plaintiff, made numerous sales of stocks on the New York Stock Exchange for plaintiff's account, certain of which resulted in short-term capital losses as follows:

| Date Sold | | Description | Price at Which Sold | Short-Term Loss Sustained |
|---|---|---|---|---|
| 8–30–46 | 800 | shares Magma Copper Co. stock | $20.–$20 ⅛ | $ 5,680.70 |
| 9–26–46 | 500 | shares Goodyear Tire & Rubber Co. stock | $56 | 3,247.88 |
| 9–26–46 | 1,000 | shares Clinton Industries, Inc., stock | $27.25 | 8,829.59 |
| 9–26–46 | 800 | shares Standard Steel Spring Co. 4% Conv. Cum. Preferred stock | $44.00 | 7,044.71 |
| 9–27–46 | 200 | shares Standard Steel Spring Co. 4% Conv. Cum. Preferred stock | $43.25 | 1,910.80 |
| 9–26–46 | 600 | shares American Air Lines, Inc., 3½% Cum. Conv. Preferred stock | $83.–83½ | 7,857.39 |
| | | Total | | $34,571.07 |

## 18.

Likewise during 1946, Irving Trust Company, acting upon the instructions of Mr. Rogers, also given pursuant to the general authorization described, and without first informing, or securing the approval of, plaintiff's mother, Mrs. Annie Norton, made a number of purchases of stocks on the New York Stock Exchange for the account of plaintiff's mother. During the months of August, September and October 1946, on or about the dates indicated, those purchases were as follows:

| Date Purchased | Description | Price at Which Purchased |
|---|---|---|
| 8–12–46 | 100 shares Montgomery Ward & Co. stock | $ 50. |
| 8–20–46 | 100 shares Libbey-Owens Ford Glass Co. stock | $ 60½ |
| 8–20–46 | 200 shares Libbey-Owens Ford Glass Co. stock | $ 60.75 |
| 8–30–46 | 200 shares General Electric Co. stock | $ 42.75 |
| 8–30–46 | 100 shares Chrysler Corporation stock | $ 104½ |
| 9–27–46 | 800 shares Magma Copper Co. stock | $ 19. |
| 9–26–46 | 500 shares Goodyear Tire & Rubber Co. stock | $ 56. |
| 9–26–46 | 800 shares Standard Steel Spring Co. 4% Conv. Cum. Preferred stock | $ 44. |
| 9–26–46 | 300 shares American Airlines Inc. 3½% Cum. Conv. Preferred stock | $ 82½ |
| 9–26–46 | 700 shares Clinton Industries stock | $ 27.25 |
| 10– 9–46 | 250 shares International Paper Co. stock | $ 41.25 |

## 19.

When the sales and purchases of stock, referred to in Findings of Fact 17 and 18, were made, under the income tax laws then in force, approximately $1 of short-term capital loss could be used by a taxpayer to offset $2 of long-term capital gain. Mr. Rogers, acting for plaintiff, instructed Irving Trust Company to make the sales of stock mentioned in Finding of Fact 17 for the purpose of establishing short-term capital losses, to offset certain long-term capital gains plaintiff had realized, or was expected to realize that year.

In supervising and handling the accounts of plaintiff and his mother, Mr. Rogers said he maintained somewhat different investment objectives as to each. In handling her account he attempted to achieve production of current income and stability, whereas in handling plaintiff's account, the emphasis was upon long-term capital growth.

When Mr. Rogers directed Irving Trust Company to purchase the stocks listed in Finding of Fact 18, the objective, he said, was to acquire for Mrs. Norton stable stocks, producing income, these being "sound and satisfactory investments especially at the revised lower prices which had occurred in the market since they were bought for Mr. Norton's account". Had it not been for the short-term capital losses intended to be achieved, these stocks probably would have been retained in plaintiff's portfolio.

Mr. Rogers was not trying to reduce stock positions in making the sales for plaintiff's account because funds raised there were reinvested in stocks, and that was also true as to his mother's account where certain sales and purchases also were made. According to Mr. Rogers, his decision to make the stock purchases for Mrs. Norton did not influence his decision to make the sales for plaintiff. He further testified that the effect of the

purchases for Mrs. Norton of some of the same stocks which were sold for plaintiff did not allow plaintiff to keep any substantial control of the stocks involved. The purchases of these stocks for Mrs. Norton's account, he said, were not made because she was a member of the same family as the seller, but because Mr. Rogers considered them good investments for her account.

### 20.

In his determination, assessment and collection of plaintiff's 1946 income taxes, the Commissioner of Internal Revenue disallowed deduction for the portion of the above described short-term capital losses corresponding to purchases of similar stocks by plaintiff's mother, on the theory that the transactions resulting in such losses represented sales by plaintiff indirectly to his mother, to the extent of such similar stocks acquired by Irving Trust Company for the account of his mother. The losses so disallowed amounted to $26,202.39, computed as follows:

| Description | Proportion Treated as Intra-Family Sale | Loss Sustained | Loss Disallowed |
| --- | --- | --- | --- |
| Magma Copper Co. stock | 800/800 | $ 5,680.70 | $ 5,680.70 |
| Goodyear Tire & Rubber Co. stock | 500/500 | 3,247.88 | 3,247.88 |
| Clinton Industries, Inc., stock | 700/1000 | 8,829.59 | 6,180.71 |
| Standard Steel Spring Co. stock | 800/1000 | 8,955.51 | 7,164.41 |
| American Airlines stock | 300/600 | 7,857.39 | 3,928.69 |
| Totals | | $34,571.07 | $26,202.39 |

### Legal Questions Presented.

#### 1.

Whether all interest on the tax deficiencies owed by the Richard W. Norton, Jr., Trust, which was not assessed or paid prior to termination of the Trust, is deductible by plaintiff, the sole beneficiary-transferee of the Trust income and principal, in the years in which it was paid by him, under the provisions of Section 23(b) of the Internal Revenue Act of 1939, 26 U.S.C. § 23(b); and,

#### 2.

Whether deduction for the short-term capital losses sustained by plaintiff, on the sales of stock described in Finding of Fact 17, disallowed to the extent described in Finding of Fact 20, is prohibited by the provisions of Section 24 (b) of the Internal Revenue Code of 1939, 26 U.S.C. § 24(b).

### Conclusions of Law.

#### 1.

The Court has jurisdiction. 28 U.S.C. §§ 1340, 1346(a) (1).

#### 2.

As to the first legal question presented, Section 23(b) of the Internal Revenue Act of 1939, 26 U.S.C. § 23(b) provides:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\*　　\*　　\*　　\*　　\*

"(b) *Interest.* All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and

originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter."

3.

Prior to 1947, the Commissioner of Internal Revenue, and some Courts, held that the person who paid interest could not deduct it unless it was interest upon his own direct, primary indebtedness. Following this theory, it was held that transferees, under Section 311(a) (1) of the Internal Revenue Act of 1939, might not take deductions from their income for interest paid by them on taxes owed by their transferor. See Nunan v. Green, 8 Cir., 1945, 146 F.2d 352; Commissioner of Internal Revenue v. Henderson, 5 Cir., 1945, 147 F.2d 619; Koch v. United States, 10 Cir., 1943, 138 F.2d 850; and Commissioner of Internal Revenue v. Green, 9 Cir., 1945, 148 F.2d 157.

In 1947, in Commissioner of Internal Revenue v. Breyer (consolidated with Commissioner of Internal Revenue v. Koppers Co.) 3 Cir., 151 F.2d 267, the Court held that when the transferee-beneficiaries of an estate received its assets from the transferor, they received them subject to any debts owed, including taxes and interest thereon to the date of transfer. Any interest accruing after the date of transfer was held to be the debt of the transferee upon money or property rightfully due the Government, and therefore deductible as being interest paid upon the transferee's own debt. Thereafter, the Commissioner accepted the doctrine of the Breyer decision (1946–1 Cum.Bull. 3; I.T. 3872, 1947–2 Cum.Bull. 19), and this was followed by him in his ruling in the present case as to the interest due, and paid by plaintiff, as described in Findings of Fact 10–13, inclusive.

It is interesting to note that the Court apparently anticipated the present case to some extent in its use of this language:

"We concur in the determination of the Tax Court, and are of the opinion that its decision should be sustained for two reasons—first, because, in our view, it is intended by the provision of the statute in question, Section 311, *that transferees are to be treated the same as any other taxpayers and allowed the deduction for interest paid in the same way as the transferors would be allowed such deductions;* \* \* \*.

\*　　\*　　\*　　\*　　\*

"It can also be persuasively contended that *it is as reasonable to consider the liability of transferees or distributees in the light of holders of property subject to a lien for taxes (and also personally liable thereon)* as it is to consider them constructive trustees subject to being forced to 'disgorge' for fraudulent conduct or breach of trust; *and this seems to have been the conclusion of the members of the Tax Court* (then the Board of Tax Appeals) in the case of the New McDermott, Inc., v. Commissioner, 44 B.T.A. 1035, *where a deduction was allowed to a company which paid interest on a mortgage on property which it owned, although it had never assumed the mortgage.*" (Emphasis supplied.) Commissioner of Internal Revenue v. Breyer, supra, 151 F.2d at pages 270, 271.

The language in The New McDermott case, mentioned in the above quotation follows the theory that where an indebtedness constitutes a lien on property of which the taxpayer is the owner, then the interest on the debt is interest on the taxpayer's indebtedness, in spite of the fact that the taxpayer may not be primarily liable for the debt. See particularly The New McDermott, Inc., case supra, 44 B.T.A. at page 1040.

4.

In the present case, the transferor (Richard W. Norton, Jr., Trust), no longer exists as an entity, and has not existed since September 6, 1944. If the deduction for interest paid is not allowed to plaintiff, as transferee of the Trust, it may not be allowed at all to

any one and will be lost merely because the deficiencies were not assessed by the Commissioner during the existence of the Trust. Here was an *inter vivos* trust, of which plaintiff was the sole beneficiary, both as to income during its existence and as to principal upon its termination. Plaintiff, the transferee, since September 6, 1944, has been the only taxable entity in existence, and he paid the tax and interest, assessed by the Commissioner after the Trust was terminated. He was personally liable as transferee, § 311(a) (1), Internal Revenue Act of 1939, 26 U.S.C. § 311(a) (1), and his property was subject to a lien in favor of defendant for the tax deficiency *and* interest. It is our opinion that the Trust's indebtedness for interest became plaintiff's own direct, primary indebtedness, not a secondary one, and that he was entitled to a deduction for the interest which accrued prior to September 6, 1944, that was paid by him on the tax deficiencies owed by the former Trust. This holding is in keeping with the rationale of the following cases: Dixie Pine Products Co. v. Commissioner, 1944, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270; Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Preston v. Commissioner, 2 Cir., 1942, 132 F.2d 763; Autenreith v. Commissioner, 3 Cir., 1940, 115 F.2d 856; Webster v. Maloney, D.C. 1953, 114 F.Supp. 726, affirmed Webster v. Gideon, 3 Cir., 1953, 213 F.2d 152; O'Brien v. Commissioner, 1942, 47 B.T.A. 561; The New McDermott v. Commissioner, 44 B.T.A. 1035; and authorities therein cited. See also the holding of the Third Circuit as to the Koppers phase of Commissioner v. Koppers, 151 F.2d 267, at pages 267, 270, 271.

### 5.

The Government argues that no deduction should be allowed to plaintiff for interest attributable to the period prior to the transfer of the assets. It bases almost its entire argument on language in the Koppers case to the effect that the liabilities of the transferor were paid by the transferee as a part of the "cost basis" of the assets received. This language is appropriate to corporate liquidations which are analogized, for tax purposes, to a sale or exchange of the liquidated assets in return for the redeemed stock. Where there is a sale with a passing of consideration there is a "cost basis" assigned to the consideration which is an element in determining subsequent gain or loss. Assumption by the transferee of liabilities of the transferor constitutes an adjustment to this "cost basis".

On the other hand, however, where assets are distributed on the termination of a trust, as here, there is no gain or loss on the transaction, no taxes incurred and "cost basis", as that term is used in connection with liquidations, is not a factor.

Nor is any adjustment made in the basis of the assets acquired upon the later payment of interest. It is the Government's contention that liability assumed, and later paid by the transferee, such as the interest due by the Trust here, may be deducted from any gain realized on subsequent sale of the assets (by means of an addition to basis). This, if carried to its logical conclusion, also would encompass the amount of the tax deficiencies themselves, not just interest, since they likewise constitute a liability of the transferor. We do not understand the latter to be the position of the Commissioner.

As we have observed, the deficiencies and interest constitute a lien against the property of the taxpayer, of which he was at all times, before as well as after the transfer, the equitable or legal owner. He was liable for the interest; it was his indebtedness and, having paid it, he clearly is entitled to a deduction *pro tanto*. If he is denied it, as we have shown, neither he nor the Trust will ever realize any tax benefit therefrom.

### 6.

Moreover, under the provisions of Section 23(a) (2) of the Internal Revenue

Code of 1939, 26 U.S.C. § 23(a) (2), all ordinary and necessary expenses paid or incurred during the taxable year for the management, *"conservation"* or maintenance of property held for the production of income are fully deductible. Here, as shown by Finding of Fact 8, all property received by plaintiff upon termination of the Trust has been held by him for the production of income. Since the deficiency assessment of taxes described in Findings of Fact 10–13, inclusive, constituted a lien against his property, and plaintiff thereby was faced with a choice of paying the taxes *and* interest, or suffering a sale of the property to satisfy the lien, in our opinion the interest was clearly an expense incurred in the *"conservation"* of such property within the meaning of Section 23(a) (2). Bingham v. Commissioner, 1944, 325 U.S. 365, 65 S.Ct. 1232, 89 L. Ed. 1670; Northern Trust Co. v. Campbell, 7 Cir., 1954, 211 F.2d 251; Baer v. Commissioner, 8 Cir., 1952, 196 F.2d 646.

This is another reason why, in our opinion, plaintiff is entitled to a deduction from his 1945 and 1946 income for all of the interest paid by him upon the indebtedness of the Trust which accrued prior to September 6, 1944.

### 7.

As to the second legal question presented, Section 24(b) of the Internal Revenue Act of 1939, 26 U.S.C. § 24(b), as here applicable, reads as follows:

"§ 24. Items not deductible

\* \* \* \* \*

"(b) *Losses from sales or exchanges of property*

"(1) *Losses disallowed.* In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

"(A) Between members of a family, as defined in paragraph (2) (D);

\* \* \* \* \*

"(2) *Stock ownership, family, and partnership rule.* For the purposes of determining, in applying paragraph (1), the ownership of stock—

\* \* \* \* \*

"(D) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; \* \* \*."

### 8.

In McWilliams v. Commissioner, 1946, 331 U.S. 694, 67 S.Ct. 1477, 1480, 91 L. Ed. 1750, the Supreme Court, having granted certiorari because of conflicts between decisions of the Circuit Courts of Appeals for the Second, Fourth and Sixth Circuits as to applicability of § 24(b), reviewed in detail the legislative history and congressional intent of the Section. In that case, the taxpayer, as manager of his own and his wife's independent estate, had ordered his broker to sell certain stocks for the account of one of the two and to buy the same number of shares of the same stock for the other, at as nearly the same price as possible, his purpose being to establish tax losses. The sales and purchases were negotiated through the Stock Exchange, the identity of the persons buying from the selling spouse, and of those selling to the buying spouse, not being known. Invariably, the buying spouse received stock certificates different from those which the other had sold. Separate income tax returns were filed, claiming the losses which the husband and the wife had sustained on the sales as deductions from gross income. The Commissioner disallowed these deductions on the authority of Section 24(b), and was reversed by the Tax Court, 5 T.C. 623, which held the Section inapplicable. The Circuit Court of Appeals for the Sixth Circuit, 158 F.2d 637, reversed the Tax Court, and it, in turn, was affirmed by the Supreme Court on certiorari, the pertinent language of its opinion reading as follows:

" \* \* \* *The difficulty of determining the finality of an intra-family transfer was one with which the*

*courts wrestled under the pre-1934 law, and which Congress undoubtedly meant to overcome by enacting the provisions of § 24(b).*

\*       \*       \*       \*       \*

"\* \* \* Section 24(b) states *an absolute prohibition*—not a presumption—*against the allowance of losses on any sales between the members of certain designated groups.* The one common .characteristic of these groups is that their members, although distinct legal entities, *generally* have a *near-identity of economic interests.* It is a fair inference that even legally genuine intra-group transfers were not thought to result, *usually, in economically genuine realizations of loss,* and accordingly that Congress did not .deem them to be appropriate occasions for the allowance of deductions.

"The pertinent legislative history lends support to this inference. The Congressional Committees, in reporting the provisions enacted in 1934, merely stated that '*the practice of creating losses through transactions between members of a family and close corporations has been frequently utilized for avoiding the income tax,*' and that these provisions *were proposed to '*deny losses to be taken in the case of [such] sales*' and 'to close this loophole of tax avoidance.*' Similar language was used in reporting the 1937 provisions. Chairman Doughton of the Ways and Means Committee, in explaining the 1937 provisions to the House, spoke of 'the artificial taking and establishment of losses where property was shuffled back and forth between various legal entities owned by the same persons or person,' and stated that 'these transactions seem to occur at moments remarkably opportune to the real party in interest in reducing his tax liability but, at the same time allowing him to keep *substantial control* of the assets being traded or exchanged.'

"We conclude that *the purpose of § 24(b) was to put an end to the right of taxpayers to choose, by intra-family transfers* and other designated devices, *their own time for realizing tax losses on investments which, for most practical purposes, are continued uninterrupted.*

"We are clear as to this purpose, too, that its effectuation obviously had to be made independent of the manner in which an intra-group transfer was accomplished. Congress, with such purpose in mind, could not have intended to include within the scope of § 24(b) only simple transfers made directly or through a dummy, or to exclude transfers of securities effected through the medium of the Stock Exchange, unless it wanted to leave a loophole almost as large as the one it had set out to close.

\*       \*       \*       \*       \*

"Nor can we agree that Congress' *omission* from § 24(b) *of any prescribed time interval,* comparable in function to that in wash sales provisions, indicates that § 24(b) was not intended to apply to intra-family transfers through the Exchange. Petitioners' argument is predicated on the difficulty which courts may have in determining whether the elapse of certain periods of time between one spouse's sale and the other's purchase of like securities on the Exchange is of great enough importance in itself to break the continuity of the investment and make § 24(b) inapplicable.

"Precisely the same difficulty may arise, however, in the case of an intra-family transfer through an individual intermediary, who, by prearrangement, buys from one spouse at the market price and a short time later sells the identical certificates to the other at the price prevailing at the time of sale. *The omission of a prescribed time interval negates the applicability of § 24(b) to the for-*

*mer type of transfer no more than it does to the latter. But if we should hold that it negated both, we would have converted the section into a mere trap for the unwary.*

"Petitioners also urge that, whatever may have been Congress' intent, its designation in § 24(b) of sales 'between' members of a family is not adequate to comprehend the transactions in this case, which consisted only of a sale of stock by one of the petitioners to an unknown stranger, and the purchase of different certificates of stock by the other petitioner, presumably from another stranger.

"We can understand how this phraseology, if construed literally and out of context, might be thought to mean only direct intra-family transfers. But petitioners concede that the express statutory reference to sales made 'directly or indirectly' precludes that construction. Moreover, we can discover in this language no implication whatsoever that an indirect intra-family sale of fungibles is outside the statute unless the units sold by one spouse and those bought by the other are identical. Indeed, if we accepted petitioners' construction of the statute, we think we would be reading into it a crippling exception which is not there." (Emphasis supplied.)

### 9.

The only appellate Court decision cited, or found, coming since the Supreme Court's decision in the McWilliams case, is McCarty v. Cripe, 7 Cir., 1953, 201 F.2d 679, relied on by plaintiff as a departure from the McWilliams doctrine. There the taxpayer permitted a farm owned by him to be sold for taxes. At the tax sale it was purchased by a trustee for a corporation more than 50% of the stock of which was owned by the taxpayer, who furnished the funds with which the trustee made the purchase. Thereafter, the trustee transferred title to the property to the corporation. The Court allowed the taxpayer to deduct the loss sustained by him at the tax sale in computing his income tax, on the theory that Section 24(b) was not applicable because the sale was "involuntary". We do not agree with the reasoning of that decision. Moreover, it is distinguishable because the sales of plaintiff's stocks here clearly were "voluntary".

### 10.

■ In the light of the Supreme Court's holding in the McWilliams case, and by the plain terms of § 24(b), we must find that the Commissioner's ruling, disallowing plaintiff's claim for refund on account of the short-term capital losses not recognized to the extent shown in Finding of Fact 20, was correct. Even if plaintiff and his mother had no direct economic control *inter se* over the affairs of each other, they did not need such control to achieve tax advantages because Mr. Rogers had it for them. They were members of the same family and, by prearrangement, each had selected the same agent with unlimited authority to handle their investments, it being expected, naturally, that in buying or selling stocks for them, he would act in the best interests of both, including tax considerations. As a measure of this, we observe that their accounts even were maintained in the same file.

Actually, there is no difference in principle between this case and McWilliams. In that case the same person—the husband—handled the sales and purchases, for himself and as agent for his wife. Here the same person—Mr. Rogers—handled the sales and purchases as agent for both plaintiff and his mother. We are sure the Court's decision in McWilliams would have been no different if, instead of the arrangement there prevailing, the husband and wife had designated a joint agent such as Mr. Rogers, by separate written agreements, to handle sales and purchases for both. Here, before and after the sales and purchases of the same stocks were made, the joint

agent for plaintiff and his mother was in charge of both accounts. Whatever his motives may have been in taking the action he did, his knowledge was theirs and his action was their action under elementary principles of Agency, as much so as if they had been dealing directly with each other. Through Mr. Rogers there was a concert of action between plaintiff and his mother. Except as to the Magma Copper stock, he acted simultaneously for both. He selected the time "* * * for realizing tax losses on investments which * * *" were sold indirectly by plaintiff to his mother, and which "* * * for most practical purposes * * *" were "* * * continued uninterrupted * * *" in the economic control of "* * * members of (the same) family * * *", as defined by § 24(b).

Plaintiff argues that an inflexible application of § 24(b) could produce absurd results; that, for example, a taxpayer living in Louisiana, attempting to achieve short-term capital losses by sales of stock, would be denied the tax benefits which otherwise would be his if his brother, at a distant point in another State, happened to buy the same stock at any time. We need not decide whether that necessarily would be the result under § 24(b), but in answer to the argument we observe that such a factual occurrence hardly could happen absent prearrangement—concert of action. If by some remote chance it did happen, we do not believe the loss would or could be disallowed if the purchase by the brother occurred more than thirty days after the sale, for if the seller himself may repurchase after that delay, without incurring disallowance of his loss, under the wash sale provision of the Internal Revenue Code, 26 U.S.C. § 118, he would be no less entitled to deduct the loss upon purchase of the same stocks by his brother after thirty days.

Plaintiff further argues that the evidence shows Mr. Rogers had a definite business objective in making the purchases for the account of his mother, since the stocks were considered to be sound investments. We think this, too, misses the point. In any family situation where one of its members holds stock which is not sound, normally he sells it and takes his loss. It is only where the price of a sound investment has dropped, so that the member of the family group holding it can sell it at a loss, that it is desirable to retain it in the family group through purchase by another member of the family. In such a situation, the loss sustained by the seller is not a real loss, for the family still owns the stock, and we believe that is the whole point of § 24(b).

Notwithstanding the slight factual differences between this and the McWilliams case, we are bound to follow here the Supreme Court's interpretation as to the sweeping, catch-all meaning and effect of § 24(b). That Court, as shown, has found the section to be "an absolute prohibition" against the allowance of losses on "any" sales between members of the same family, directly or indirectly, and the latter is exactly the case before us. Therefore, plaintiff's claim for refund of taxes and interest paid by him, with respect to disallowance of deductions for his short-term capital losses, as described in Finding of Fact 20, will be rejected.

**11.**

For these reasons, there will be judgment for plaintiff for refund of the assessment made against him by the Commissioner, and paid by plaintiff on November 1, 1949, to the extent that said assessment disallowed deduction of interest paid by plaintiff on taxes owed by the Richard W. Norton, Jr., Trust, which interest had accrued prior to September 6, 1944. Plaintiff also will have judgment for 6% per annum interest on the amount of the refund herein allowed from November 1, 1949. Otherwise, his demands will be rejected.

Proper decree, in accordance with these findings, should be presented.